UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Allan Block Corporation,

       Plaintiff,

v.                                                                                    Civ. No. 04-3511 (JNE/JGL)
                                                                                      ORDER
E. Dillon & Co.,

       Defendant.

---

Cynthia L. Bauerly, Esq., Darren B. Schwiebert, Esq., and Kurt J. Niederleucke, Esq., Fredrikson & Byron, P.A., appeared for Plaintiff Allan Block Corporation.

Kristan B. Burch, Esq. and Stephen E. Noona, Esq., Kaufman & Canoles, and Paula W. Theisen, Meagher & Geer, P.L.L.P., appeared for Defendant E. Dillon & Co.

---

Allan Block Corporation brought this action against E. Dillon & Co. (Dillon) for breach of contract and patent infringement. The matter is before the Court on Allan Block's motion for a preliminary injunction. For the reasons set forth below, the Court grants the motion in part.

## I.    BACKGROUND

Allan Block is a Minnesota corporation involved in the development and licensing of a cement block (Block(s)) and related technology to be used in the construction of segmental retaining walls (SRW).[1] Allan Block owns United States Patent Nos. 5,484,236 and 4,909,010, titled "Method of Forming Concrete Retaining Wall Block" and "Concrete Block for Retaining Walls," respectively. The Blocks are used to create a setback retaining wall and they secure together by way of a raised front, top lip, and bottom notch. Allan Block licenses the Block,

---

[1] SRW blocks are generally made by pouring concrete into a mold to form the block. SRW blocks allow for the construction of walls without the use of mortar, instead using interconnecting features to secure the wall.

1

corresponding molds used to create the Block (Molds), and related technology to regional manufacturers. Each regional manufacturer has the exclusive right to manufacture the Block in a particular area and to sell the Block in return for royalties.

Dillon is a Virginia corporation that has produced and sold specialized dolomitic limestone products for more than 100 years. In 1991, Allan Block and Dillon entered into a Production Agreement (Agreement), which granted Dillon a license to use and possess the Molds for the purpose of manufacturing and selling the Block. In return, Dillon agreed to pay Allan Block a royalty fee for each Block sold. Also under the Agreement, Dillon agreed to use Allan Block's "Technology, including but not limited to the Molds, only for the manufacture of the Block within the Territory and only for the sale of the Block under [Allan Block] Marks." The Agreement defines "Technology" as:

> The Molds, the application for the patent, the foregoing technology, and all other unpatented, related know-how, trade secrets, processes, designs, technical data and inventions, whether patentable or not, owned or used by Licensor in connection with the Block.

Dillon further agreed to promptly notify Allan Block of any improvement, betterment, or modification of the Block and/or Technology; not to utilize any such improvement without Allan Block's prior written consent; and that Allan Block shall own the rights to any such improvement. Finally, in the event of a termination of the Agreement, Dillon agreed to immediately cease use of the Technology, return all Technology, and cease manufacture of the Block.

During the course of the Agreement, Allan Block provided components of its technology, such as product designs and specifications, Mold designs and specifications, construction specifications, mix designs, product testing information, and engineering support to Dillon and its exclusive distributors. Sometime in 2002, while continuing to manufacture the Block, Dillon

began seeking ways to "compete in the cheap block market" and decided to create a new block to displace Allan Block business. Barry Link, Manager of Operations for Dillon, developed the new block, which was later named the StoneLoc block. Instead of using the "lip and notch" design of the Block, the StoneLoc block uses molded, wedge-shaped protrusions (lugs) on the bottom of the side walls of the block that extend downward into the cavity of the block beneath and behind the upper block to secure the blocks together. David Skidmore, President of Dillon, explained in a memorandum that Dillon's new block would be "performing the same function as the Allan Block lip and notch" and that "we cannot only make block [sic] that perform exactly the same but also look exactly the same, at least to the untrained eye." Dillon began to manufacture and sell the StoneLoc block in 2004 and continues to do so today.

Allan Block learned of Dillon's StoneLoc block in February 2004. In May 2004, Allan Block notified Dillon that the production and sale of the StoneLoc block was prohibited by law and the terms of the Agreement. Allan Block also demanded that Dillon stop the manufacture and sale of the StoneLoc block or it would terminate the Agreement in 120 days. After Dillon allegedly failed to make timely payments, Allan Block declared an Event of Default on July 27, 2004. Allan Block filed this lawsuit on August 2, 2004, and a motion for temporary restraining order the following day. On August 13, 2004, the Court denied Allan Block's motion. The parties agreed to conduct expedited discovery to develop a record for the current motion.

## II.   DISCUSSION

Allan Block argues it is entitled to a preliminary injunction that: (1) prohibits Dillon from using Allan Block's Technology and from manufacturing and selling StoneLoc blocks; (2) compels Dillon to immediately return its Technology, including its Molds, as well as the technology and molds for the StoneLoc block; (3) requires Dillon to assign to Allan Block all

patent applications filed by Dillon relating to modifications of the Block; and (4) enjoins further alleged infringement of its patents. The record here is sufficient to address whether Dillon should be prohibited from manufacturing and selling StoneLoc blocks. The Court will consider only Allan Block's contract claims as a basis for injunctive relief.

Injunctive relief may be granted only if the moving party can demonstrate: (1) a likelihood of success on the merits; (2) the movant will suffer irreparable harm absent the restraining order; (3) the balance of harms favors the movant; and (4) the public interest favors the movant. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). Injunctive relief is an extraordinary remedy, *see Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987), and the party requesting the injunction bears the "complete burden" of proving all the factors listed above. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987). While no one factor is determinative, likelihood of success on the merits is generally the touchstone inquiry. *Dataphase*, 640 F.2d at 113*; see also S & M Contractors, Inc. v. Foley Co.,* 959 F.2d 97, 98 (8th Cir. 1981).

**A.     Likelihood of success on the merits**

Allan Block argues Dillon breached the Agreement by modifying the Block, improperly using the Technology, failing to notify Allan Block that it had created a modified block, and failing to seek written consent to manufacture and sell the modified block. At the core of Allan Block's contract claims is its argument that Dillon breached paragraph 8.9 of the Agreement, which reads:

> Producer shall promptly notify Licensor of any improvement, betterment or modification of the Block and/or the Technology of which Producer is aware ("Producer's Improvement"). Producer may utilize Producer's Improvement only with the prior written consent of Licensor and at Producer's expense. Licensor shall own the rights to and Licensor may utilize Producer's Improvement without any payment to Producer. Licensor shall, in turn, promptly notify Producer of any

improvements, betterment or modification of the Block and/or the Technology of which Licensor is aware ("Licensor Improvement"). Producer may utilize Licensor's improvement at Producer's expense.

Also relevant to this claim is paragraph 8.8, which provides: "Producer will use the Technology, including but not limited to the Molds, only for the manufacture of the Block within the Territory and only for the sale of the Block under the Marks."

Allan Block has submitted extensive evidence that Dillon's StoneLoc block is a modification of the Block that was created through the improper use of Allan Block Technology, including designs and drawings of the Block, mold parts, and other mold technology. For example, there is evidence that Link sent drawings of the Block to Columbia Machines, a third-party producer, for the purpose of designing the StoneLoc block.[2] In fact, Link testified that he sent a drawing to Columbia Machines that contained an overall layout of the Allan Block "footprint" and a locking mechanism of his own design. The drawing was actually an altered version of an Allan Block drawing.[3] In addition, Dillon sent an actual Allan Block drawing entitled "Allan Block Key Cap Block" to Columbia Machines. Although Dillon claims that this drawing was not sent in connection with the production of StoneLoc, it was faxed on July 17, 2003, precisely the time period that Dillon and Columbia Machines were designing the StoneLoc block. During the on-going process of designing the StoneLoc block, Dillon sent additional drawings and sketches of Allan Block designs to Columbia Machines bearing various alterations.

---

[2] The record reveals that Columbia Machines already possessed some of the drawings because it had manufactured the Block. Given Dillon's purpose in sending drawings to Columbia Machines, Columbia Machines' prior possession of these drawings is not significant.

[3] A visual comparison of the Allan Block drawing and the altered version reveals that Allan Block's name was removed from the drawing, the drawing was re-titled "Lugged SRW" (which Dillon was using to refer to what would become StoneLoc), and certain modifications were made to the drawing to illustrate the "lug" design.

In addition, there is evidence that Dillon used Mold parts to produce its StoneLoc product. For example, Craig Coleman of Columbia Machines testified that for StoneLoc, Dillon used two frames (one for a corner and one for a cap) previously used to make Allan Block products. In August 2003, Link and Coleman discussed modified molds via telephone, and Link's notes from that conversation reveal that they discussed the Block. That same month, Columbia Machines provided Dillon with a quote for its newly developed StoneLoc molds, providing prices for a "set of parts to convert existing Allan Block corner mold" and a "set of parts to convert existing Allan Block cap mold." Soon thereafter, Dillon placed the order for those molds.

Additional evidence in the record supports the conclusion that the StoneLoc block is a modification and that the Allan Block design and related Technology was used extensively in its development. For example, Columbia Machines' sketches for the StoneLoc block mold identify the same drilling holes as those found in Allan Block's design. Further, in developing marketing materials for the StoneLoc block, it was suggested that Dillon provide "current pieces of Allan Block literature, or competitive literature, that you should like to have 'duplicated' to fit the StoneLoc Product." There is also evidence that Dillon, through its distributor GeoSpec Environments (GeoSpec), intended to manufacture a complete line of new blocks that would closely correspond with Allan Block designs. In explaining the transition from Allan Block to StoneLoc, a representative of GeoSpec stated that "[b]ecause the face and unit aesthetics once installed are so similar and the colors are the same, most dealers have determined not to replace any displays."

Dillon, on the other hand, argues that it created a wholly new and unique "lug" design locking mechanism for a block and that the StoneLoc block is not a modification of Allan

6

Block's Block.  Dillon concedes that it did reuse certain mold parts previously used to make Allan Block products and referenced drawings and designs of the Block during the creation of the StoneLoc block, but argues that it was permitted to do so because these parts and designs contained basic, non-proprietary features of the Block.  Dillon argues that neither the Agreement nor its addendum (Addendum) prohibit the use of generic features of the Block.  Instead, Dillon claims that the Agreement only prohibits the use of the Block's patented features and that the Addendum recognizes that the Molds include parts that are not part of Allan Block's Technology.

In making this argument, Dillon seems to suggest that the Agreement permitted it to modify or improve the Block under the Agreement, so long as any final product did not embody the proprietary features of the Block.  Dillon claims that a broader reading of Agreement would amount to a perpetual non-compete in violation of public policy.  Dillon's argument, however, depends on a reading of the Agreement and the Addendum that conflicts with their unambiguous language.  *See Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1436 (8th Cir. 1995) (noting that under Minnesota law, a court should determine the meaning of a contract in accordance with its plainly expressed intent); *Minneapolis Pub. Hous. Auth. v. Lor*, 591 N.W.2d 700, 704 (Minn. 1999) (unambiguous contract language is to be given its plain and ordinary meaning and shall be enforced even if result is harsh).  Technology is defined broadly in the Agreement as "[t]he Molds, the application for the patent, the foregoing technology, and all other unpatented, related know-how, trade secrets, processes, designs, technical data and inventions, whether patentable or not, owned or used by Licensor in connection with the Blocks."  In addition, paragraph 8.8 expressly prohibits Dillon from using any of this Technology for any purpose other than for the manufacture and sale of the Block under Allan

7

Block's marks. On its face, the Agreement's definition of Technology is *not* limited to the patented features of the Block. Nor does the Agreement allow for the use of any Technology (patented or unpatented) to modify the Block or to develop a competing block.

Similarly, Dillon's reliance on the Addendum is misplaced. The Addendum provides:

> Notwithstanding anything contained in the Production Agreement, upon termination of the Production Agreement, and for (6) months thereafter, Producer shall have the right to sell those parts of the Molds that are specifically related to the Block or the Technology (including stripper shoes) to any other company which is then an authorized manufacturer of Allan Block, with the approval of Allan Block Corporation, provided that the purchaser shall agree that any Mold part purchased by it should be treated in the same manner as Molds then owned by it under any agreement that it has with Allan Block Corporation. In the event that any such parts are not sold within said six (6) month period following termination of the Production Agreement, Allan Block Corporation will have the right to acquire those mold parts that are specifically related to the Block or the Technology (including the stripper shoes) at Book Value. If Licensor does not exercise this, Producer shall have the right to retain such Mold parts, but Producer shall have no right to make use of such parts. Those parts of the Molds that are not specifically related to the Block or the Technology shall be the property of Producer, and Producer shall be free to use or sell such parts as it sees fit.

Dillon asserts that the Addendum gives it the right to use any "generic" parts of the Molds to design and develop its own Block. The Court disagrees. On its face, the Addendum divides Mold parts into "related" and "unrelated" parts only *upon termination* of the Agreement. Therefore, even if Dillon used only "unrelated" mold parts to develop the StoneLoc block, because Dillon used these parts during the life of the Agreement, the Addendum was not controlling. In addition, the Addendum in no way alters the Agreement's prohibition against the use of Technology (patented or unpatented) for any purpose *other than* for the manufacture and sale the Block. Nor does it equate "specifically related" parts with those covered by Allan Block's patents. Therefore, based on the clear language of the Agreement and the Addendum, Dillon was prohibited from developing the StoneLoc block by using any part of Allan Block's Molds or Technology.

8

The extensive evidence submitted by Allan Block supports a finding that Dillon modified the Block by replacing the "lip and notch" with a "lug" design. [4] Therefore, the Court concludes that Allan Block is likely to succeed on its claim that Dillon breached paragraph 8.9 by failing to notify Allan Block of this modification and failing to seek prior written consent to manufacture and sell the StoneLoc block. Because paragraph 8.9 also explicitly provides that Allan Block "shall own the rights to . . . Producer's Improvement," Allan Block is likely to succeed in demonstrating that it owns the rights to the StoneLoc block.

Paragraph 10.1 of the Agreement requires Dillon to cease use of the Technology, cease manufacture of the Block, and return all Technology, upon termination of the Agreement. Because Allan Block is likely to succeed in demonstrating that the StoneLoc block is a modification, it is also likely to succeed in demonstrating that Dillon breached paragraph 10.1 of the Agreement by continuing to manufacture and sell the StoneLoc block.

Because there is a substantial likelihood that Allan Block will prevail on the above-discussed breach of contract claims, this factor weighs heavily in favor of granting a preliminary injunction. [5]

**B.   Irreparable harm**

Having concluded that Plaintiff has met its burden of establishing a likelihood of success on the merits, the Court turns to the remaining *Dataphase* factors, beginning with irreparable harm. "[T]o warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm." *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir.

---

[4]   This conclusion is further supported by the opinions of Allan Block's experts, Paul Forsberg and Alain Dorais, who conclude that the StoneLoc block is a modification of the Block.

[5]   The Court declines to consider Allan Block's remaining breach of contract claims at this time.

9

1999) (citation omitted).[6] A preliminary injunction should not be granted when any harm which the moving party will suffer between the time of the preliminary injunction and the trial can be adequately compensated by money damages and a permanent injunction. *Id*.

Allan Block asserts that it is suffering irreparable harm from Dillon's breach of the Agreement in the form of consumer confusion, harm to reputation and goodwill, and harm to its licensing structure. Allan Block further asserts that this alleged harm cannot be fully compensated with monetary damages. Dillon, on the other hand, argues that any harm to Allan Block is speculative because the harm has not yet occurred and because Allan Block has not demonstrated that any harm is imminent.

There is little doubt that Allan Block will suffer harm if Dillon is allowed to continue to sell the StoneLoc block; the relevant inquiry is whether this harm is irreparable or whether money damages will make Allan Block whole. Paragraph 14 of the Agreement provides:

> Producer acknowledges and agrees that, because of the unique nature of the Technology, the Marks, the Confidential Information, and any other matters relating to the rights granted to Producer under this Agreement, Licensor shall be entitled to any and all appropriate equitable relief, whether or not an adequate remedy at law may be deemed to be available, in order to prevent a breach of this Agreement or to enforce the provisions hereof.

While this provision, alone, does not support a finding of irreparable harm, it does lend weight to Allan Block's contentions regarding the nature of the harm it will suffer because it is evident that the parties contemplated that a breach of the Agreement could cause irreparable harm. *See Dominion Video Satellite, Inc. v. Echostar Satellite Corp*., 356 F.3d 1256, 1266 (10th Cir. 2004).

---

[6] Dillon claims that Allan Block has failed to demonstrate actual harm. While probative on the issue of whether Allan Block can demonstrate a sufficient threat of irreparable harm, the Court emphasizes that, at this stage of the litigation, Allan Block need not demonstrate actual harm suffered, but rather that injury is imminent. *See Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986).

Allan Block has also submitted affirmative evidence of irreparable harm. For example, the risk that consumers will not be able to differentiate between the StoneLoc block and the Block is real and significant. Dillon, itself, admits that it is difficult to tell the blocks apart. In addition, a distributor for Dillon acknowledged the respective blocks' substantial similarity when he explained that "most dealers have determined not to replace any displays" because "the face and unit aesthetics once installed are so similar and the colors are the same." Finally, Allan Block has provided proof of such confusion via the Declaration of Mike Miller.[7] Miller, a general contractor in North Carolina, ordered approximately 300 Allan Block Blocks from a supplier it located on Allan Block's website. The supplier delivered StoneLoc blocks without indicating their true source. Instead, Miller was told that the blocks (which he believed were manufactured by Allan Block) were a lighter "re-design." It was not until Miller contacted Allan Block's engineering department for installation assistance that he discovered the blocks were not an Allan Block product. In light of this evidence, the Court finds that Allan Block has demonstrated that consumers will likely be unable to differentiate between its Block and the StoneLoc block. This likelihood of confusion is exacerbated by the fact that Dillon manufactured and sold the Block for over ten years and consumers will likely associate Allan Block products with Dillon.

In addition, the risk that Allan Block will lose control over the quality of its products and its reputation is imminent; particularly because consumers are likely to be confused. The loss of

---

[7]   On May 31, 2005, Allan Block made a motion for leave to file supplemental evidence—the Declaration of Mike Miller—in support of its motion for preliminary injunction. Dillon opposes the submission of this evidence, arguing that it has been untimely submitted and that Dillon would be prejudiced by the late submission of evidence. Considering the nature of Allan Block's requested relief, the relevancy of the Miller declaration, and the fact that the events about which Miller testifies did not occur until after the motion hearing, the Court grants Allan Block's motion for leave to file supplemental evidence.

11

intangible assets, such as harm to reputation, can constitute irreparable injury.  *See United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002).  This is because "[h]arm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars."  *Medicine Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003).  Allan Block argues that StoneLoc blocks are inferior to its Block because they have not undergone adequate testing to ensure against wall failures.  According to Allan Block's expert Paul Forsberg, a consultant working for Keystone Retaining Wall Systems, Inc., the StoneLoc block is unproven and potentially inferior, and Dillon's "lug" design has not been fully tested or had enough practical experience to ensure safe installation.  Despite the fact that there is no actual evidence of inferiority, the Court agrees that Allan Block will be irreparably harmed should the StoneLoc block fail or experience other technical problems because such a failure will likely be attributed to Allan Block.  *See United Healthcare*, 316 F.3d at 741 (affirming district court's finding of a threat of irreparable harm as a result of *potential* loss of reputation and goodwill, explaining threat is not speculative because of lack of complaints where it might take months for loss of goodwill to become manifest).  This type of harm posed by a defect, or potential defect, has also been held to be irreparable in trademark cases.  *See, e.g., Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587, 591 (5th Cir. 1993) ("The common thread in [prior cases] where trademark infringement was found is that each involved some defect (or potential defect) . . . that the customer would not be readily able to detect."); *Minn. Mining and Mfg. Co. v. Rauh Rubber, Inc.*, 943 F. Supp. 1117, 1129, 1133 (D. Minn. 2004) (holding plaintiff's loss of control over quality of its product risks damage to reputation).  Those cases, by analogy, are persuasive here.

Finally, Allan Block argues that its licensing structure will be irreparably harmed if a

preliminary injunction is not granted.  Specifically, Allan Block claims that if Dillon's breach remains unchecked, other producers may follow its lead and develop and manufacture their own modified blocks.  The Court is not persuaded that the threat that others will choose to breach their contracts represents an imminent harm because a denial of a preliminary injunction would not be an endorsement of any alleged breach on the part of Dillon.  However, the Court does find that Dillon's sale of its StoneLoc block in violation of the Agreement will harm Allan Block's license network because it will harm its market position.  *Cf. PPG Indus., Inc. Guardian Indus. Corp.*, 75 F.3d 1558, 1566 (Fed. Cir. 1996) (affirming district court's finding in patent case that party was entitled to presumption of irreparable harm and that party's market position would be threatened).  This is particularly true considering the evidence that StoneLoc blocks have been sold to at least one customer who specifically requested, through an Allan Block supplier, Allan Block Blocks.  Therefore, it is likely that Allan Block is losing customers, even though the customers themselves are unaware that they are purchasing non-Allan Block products.  The threat that this type of event will be, or has been, repeated is real and imminent.

Dillon, on the other hand, claims that Allan Block's licensing network precludes a finding of irreparable harm, arguing that any resulting damage could be compensated through a monetary award.  The Court acknowledges that the Federal Circuit has held in patent infringement cases that evidence of licensing can suggest that any injury sustained due to infringement would be compensable in money damages.  *See, e.g., High Tech Med. Instr. v. New Image Indus., Inc.*, 49 F.3d 1551, 1556-57 (Fed. Cir. 1995).  The Federal Circuit's decision in *High Tech*, however, is distinguishable from the case at hand for several reasons.  First, the Federal Circuit noted that the district court's finding of irreparable harm was not based on any affirmative showing, but instead on a presumption stemming from the patentee's showing on the

13

merits of its patent infringement claims. *Id*. at 1556. Second, the Federal Circuit held that the presumption was unavailable and explained that "[a]side from the presumption, the district court pointed to no evidence that would support a finding of irreparable injury." *Id*. Finally, the Federal Circuit went on to explain that a combination of factors, including an unexplained, substantial period of delay, the plaintiff's inactivity in the market and willingness to license, along with the absence of an indication that money damages would suffice, all suggested that there was no compelling need for preliminary relief. *Id*. at 1556-57.

Here, the Court is not relying on a presumption of irreparable harm and Allan Block has submitted affirmative evidence of a combination of harms caused by Dillon's breach, including consumer confusion, loss of quality control, harm to reputation and goodwill, and harm to its competitive market position. These harms, taken together, cannot be fully compensated by a monetary award. Further, a delay of six months from the time Allan Block discovered the StoneLoc block and to the filing of suit, under the circumstances presented, does not negate the existence of irreparable harm. Accordingly, the Court concludes that Allan Block has demonstrated a sufficient threat of irreparable harm.

**C.     Balance of the harms**

The Court recognizes that an injunction that halts the sale of StoneLoc blocks will harm Dillon's business. However, Dillon has represented that it manufactures a wide variety of concrete products and is free to continue to manufacture products other than the StoneLoc block. In contrast, the Court has already determined that Allan Block will be irreparably harmed if Dillon is allowed to continue to manufacture and sell its StoneLoc blocks. On balance, this factor weighs in favor of injunctive relief.

**D.     Public interest**

Finally, the Court concludes that the public interest is served by upholding the parties' contractual obligations. *See N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984) (explaining that the public interest calls for the enforcement of valid agreements). Public policy "requires that freedom of contract shall remain inviolate, except only in cases which contravene public right or the public welfare." *Arrowhead Elec. Coop., Inc. v. LTV Steel Mining Co.*, 568 N.W.2d 875, 879 (Minn. Ct. App. 1997) (quoting *Weirick v. Hamm Realty Co.*, 228 N.W. 175, 176 (Minn. 1929)). Indeed, a core component of the role of a court is to uphold valid contracts and, therefore, this factor weighs in favor of granting injunctive relief.

After weighing all of the factors discussed above, the Court concludes that Allan Block is entitled to a preliminary injunction. Accordingly, Dillon is enjoined from manufacturing and selling StoneLoc blocks. The preliminary injunction will be conditioned upon Allan Block posting a bond. The parties have not adequately addressed the issue of an appropriate bond amount. The Court therefore directs the parties to submit letter briefs on the issue of an appropriate bond amount. The Court stays the injunction until after the determination and posting of the bond.

### III.  CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Allan Block's motion for a preliminary injunction [Docket No. 89] is GRANTED IN PART.

2. Allan Block's motion for leave to file supplemental evidence [Docket No. 122] is GRANTED.

3. The parties shall submit letter briefs, not to exceed five (5) pages, no later than July 15, 2005, addressing the issue of an appropriate bond amount.

4. Dillon is preliminarily enjoined from manufacturing and selling the StoneLoc block.  The injunction is STAYED pending a determination of an appropriate bond amount.

Dated: July 1, 2005

s/ Joan N. Ericksen_____<br>
JOAN N. ERICKSEN<br>
United States District Judge